UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID WILLIAMS**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION**, *et al.*,<br><br>Defendants. | Case No. 26-cv-564 (CRC) |

**MEMORANDUM OPINION**
(Partially-Redacted Version of ECF No. 24)

Only a few months before the Artemis II mission opened the door to future lunar and deep-space exploration, the National Aeronautics and Space Administration ("NASA") closed another door here on Earth. Namely, in late 2025, NASA ceased in-person services at the agency's largest research library located on the campus of the Goddard Space Flight Center ("GSFC") in Greenbelt, Maryland. It also initiated a 60-day assessment of the library collection to determine which materials would be preserved by the agency and suspended access to the NASA Space Science Data Coordinated Archive (the "Database"), a permanent archive for space mission documentation.

Plaintiffs in this case—two NASA-affiliated scientists and a labor organization representing federal employees at GSFC—filed this lawsuit against NASA, the NASA Administrator, and the Archivist of the United States. They allege that NASA's decision to shutter the Goddard Library and take the Database offline violates the Federal Records Act ("FRA") and the Administrative Procedure Act ("APA"). Plaintiffs now move for a temporary restraining order and/or preliminary injunction, warning of the "imminent threat" that federal records and unique materials in the Goddard Library collection will be permanently lost unless

the Court intervenes.  But because Plaintiffs have failed to make the necessary showing for this extraordinary relief, the Court must deny the motion.

## I.    Background

Before turning to the specifics of Plaintiffs' motion for preliminary injunctive relief, the Court first surveys the relevant legal and factual background.

### A. Legal Background

The FRA is a series of statutes that "govern[] the creation, management[,] and disposal of federal records." Armstrong v. Bush (Armstrong I), 924 F.2d 282, 284 (D.C. Cir. 1991); see also Am. Friends Serv. Comm. v. Webster, 720 F.2d 29, 36 (D.C. Cir. 1983) (explaining that the FRA "establish[es] a unified system for handling the 'life cycle' of federal records—covering their creation, maintenance and use, and eventually their disposal by either destruction or deposit for preservation").  Congress enacted the FRA to ensure "(1) efficient and effective records management; (2) accurate and complete documentation of the policies and transactions of the Federal Government; and (3) judicious preservation and disposal of records." Armstrong I, 924 F.2d at 284–85 (alterations and internal quotation marks omitted) (quoting 44 U.S.C. § 2902); see also id. at 292 (noting Congress's intent that agency records management programs "strike a balance between developing efficient and effective records management[] and the substantive need for Federal records" (citation and internal quotation marks omitted)).  Two components of the FRA are relevant here: its records preservation scheme and its enforcement scheme.

### 1. Preservation of Federal Records

To ensure the preservation of federal records, the FRA "burdens the heads of federal agencies with several obligations." Armstrong v. Exec. Off. of the President, Off. of Admin. (Armstrong II), 1 F.3d 1274, 1278 (D.C. Cir. 1993) (per curiam); see Kissinger v. Reps. Comm.

2

for Freedom of Press, 445 U.S. 136, 147 (1980). Broadly speaking, agency heads must "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]" 44 U.S.C. § 3101; see Armstrong II, 1 F.3d at 1278. Each agency must also maintain a records management program and establish "safeguards against the removal or loss of records." 44 U.S.C. §§ 3102, 3105; see Armstrong I, 924 F.2d at 293. The Archivist of the United States provides "guidance and assistance" to agencies regarding their records management programs and the proper disposition of records. 44 U.S.C. § 2904(a); see Competitive Enter. Inst. v. EPA, 67 F. Supp. 3d 23, 26 (D.D.C. 2014).

"Because [the] FRA is primarily directed at the preservation of federal records, the crux of the statute lies in its disposal provisions." Competitive Enter. Inst., 67 F. Supp. 3d at 26. Put simply, an agency may not "alienate[] or destroy[] records" unless provided by the FRA. 44 U.S.C. § 3314; see Armstrong II, 1 F.3d at 1278 ("[T]he FRA prescribes the exclusive mechanism for disposal of federal records."). The term "records" includes

> all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them.

44 U.S.C. § 3301(a)(1)(A). Notably, the term "records" does *not* include "library and museum material made or acquired and preserved solely for reference or exhibition purposes" or "duplicate copies of records preserved only for convenience." Id. § 3301(a)(1)(B).

If a document is a "record," then the FRA "prohibits an agency from discarding it by fiat." Armstrong II, 1 F.3d at 1278 (citing Webster, 720 F.2d at 62). Instead, the Archivist must approve an agency's disposal of any record. See id. at 1279; Competitive Enter. Inst., 67 F.

3

Supp. 3d at 27. An agency may obtain the Archivist's approval "in one of two ways." Armstrong II, 1 F.3d at 1279. First, the agency may "submit a schedule of records sought to be discarded to the Archivist." Id. If the Archivist concludes that the records do not have "sufficient administrative, legal, research, or other value to warrant their continued preservation by the Government," then he may "empower the agency to dispose of those records" after providing public notice and an opportunity to comment. 44 U.S.C. § 3303a(a); see Competitive Enter. Inst., 67 F. Supp. 3d at 27. Second, the agency may "jettison certain common types of records pursuant to disposal schedules promulgated in advance by the Archivist." Armstrong II, 1 F.3d at 1279 (citing 44 U.S.C. § 3303a(d)); Competitive Enter. Inst., 67 F. Supp. 3d at 27 (noting that the FRA "provide[s] for the recurring disposal of certain categories of records."). Under these preapproved disposal schedules, records are designated as either "permanent records" to be transferred to the National Archives and Records Administration ("NARA") for preservation, see 36 C.F.R. § 1225.14, or "temporary records" that may be destroyed after the prescribed retention period, see id. § 1225.16; Competitive Enter. Inst., 67 F. Supp. 3d at 27.

### 2. Enforcement Scheme

In addition to the safeguards described above, the FRA "sets forth a structure whereby the Archivist and agency heads are to work together to ensure that no documents are unlawfully destroyed." Jud. Watch, Inc. v. Tillerson, 293 F. Supp. 3d 33, 37 (D.D.C. 2017), aff'd sub nom. Jud. Watch, Inc. v. Pompeo, 744 F. App'x 3 (D.C. Cir. 2018). Relevant here, the agency head is required to "notify the Archivist of any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records in the custody of the agency[.]" 44 U.S.C. § 3106(a). With the Archivist's assistance, the agency head must then "initiate action through the Attorney General for the recovery of records the [agency head]

4

knows or has reason to believe have been unlawfully removed from that agency[.]" Id.; see Kissinger, 445 U.S. at 148. While "there may be ambiguities" as to what this requirement entails, it includes "at least a duty to 'ask the Attorney General to initiate legal action.'" Jud. Watch, Inc. v. Kerry, 844 F.3d 952, 953–54 (D.C. Cir. 2016) (quoting Armstrong I, 924 F.2d at 295).

If the agency head "ignores this statutory mandate," the Archivist must step in. Price v. DOJ, No. 18-cv-1339 (CRC), 2019 WL 2526439, at *4 (D.D.C. June 19, 2019). Specifically, if the agency head does not initiate action through the Attorney General "within a reasonable period of time" or "is participating in, or believed to be participating in" the unlawful action, the Archivist must ask the Attorney General to initiate a recovery action and notify Congress once the request has been made. 44 U.S.C. § 3106(b); see Am. Oversight v. Hegseth, 788 F. Supp. 3d 14, 19 (D.D.C. 2025). As explained in more detail below, the FRA "specifies only these enforcement roles and does not provide an express cause of action for private litigants to redress the unlawful removal of agency records." CREW v. DHS, 527 F. Supp. 2d 101, 109 (D.D.C. 2007); see Kissinger, 445 U.S. at 148 (describing this enforcement scheme as the "only . . . remedy for the improper removal of a 'record' from an agency" under the FRA).

### 3. NASA's Records Schedules

Per the FRA, NASA has issued a policy directive requiring employees to "[i]dentify, preserve, and protect records, including temporary records, permanent records, and vital records, against loss, theft, unauthorized release or change[.]" NASA Policy Directive 1440.6I § 1(a)(2) (Sep. 10, 2014), https://perma.cc/VE8Q-7AWU. With the Archivist's approval, the agency has also adopted a series of records retention schedules. See Compl. ¶ 7 & n.1; NASA Records Retention Schedules ("NRRS") (Sep. 3, 2025), https://perma.cc/D9DV-QZNB. Plaintiffs'

complaint and motion focuses on one schedule within the series: "DAA-0255-2024-0002," which relates to NASA's "Agency Archival Collections." See Opp'n, App. 1 ("NASA Archival Collections Schedule"); Defs.' Opp'n to Pls.' Emergency Mot. for TRO & Prelim. Inj. ("Opp'n") at 4; Pls.' Reply in Supp. of Emergency Mot. for TRO & Prelim. Inj. ("Reply Br.") at 8; Rough Hr'g Tr. 18:6–7 (agreeing that records schedule DAA-0255-2024-0002 "pertain[s] to the sorting of materials at the library").

The NASA Archival Collections Schedule—which is part of the broader NRRS—applies to NASA's "archival collections," which are "created and maintained for preservation and access to materials that the agency considers historically, technologically, scientifically, culturally, and/or intrinsically significant." Opp'n, App. 1 at 4. Under the schedule, NASA must retain the records "indefinitely . . . until no longer needed or [the] dissolution of the agency/agency archival program." Id. at 5. If the records are no longer needed, the agency must afford NARA the right of first refusal. Id. Before implementing the NASA Archival Collections Schedule, NARA published it the Federal Register and invited public comment. See Records Schedules; Availability and Request for Comments, 89 Fed. Reg. 99913-01 (Dec. 11, 2024). No comments were submitted in opposition to the proposed records schedule, and NARA approved it in August 2025. See Opp'n at 4.

B. Factual Background

Plaintiffs' motion for preliminary relief encompasses three related components of NASA's operations: the Goddard Library, the materials within the library, and the Database.

*1. The Goddard Library*

NASA operates 20 "centers" and "facilities" across the United States, including GSFC. Declaration of Gary Willis (ECF No. 18-1) ("Willis Decl.") ¶ 5. GSFC is the agency's "largest

6

institute of scientists, technologists, and engineers responsible for the development of Earth and space science missions." Declaration of Tryshanda Moton (ECF No. 3-2) ("Moton Decl.") ¶ 3. Located in Greenbelt, Maryland, GSFC's main campus consists of 1,270 acres of land and more than 4 million gross square feet of building space. See Compl. ¶ 66 n.7 (NASA, Master Plan Digest 4 (2022), https://perma.cc/6FKN-P6S8 ("2022 Master Plan")).

The Goddard Library, which "has historically functioned as NASA's largest research library," is located within Building 21 of GSFC's Greenbelt campus. Moton Decl. ¶ 4. The library houses approximately 127,000 items, including books, journals, reference materials, technical reports, oversize documents, atlases, and other media. See Willis Decl. ¶ 48. Among these items are "unique, copyrighted, and out-of-print records and materials, many of which have not been digitized and are unavailable anywhere else." Moton Decl. ¶ 4.

Like many other federal workers, NASA employees "are now more likely to use electronic library research services and resources," and they "rel[y] on physical libraries less and less." Willis Decl. ¶ 8. Nevertheless, at least some current and former NASA employees have routinely used the Goddard Library's physical space and materials to conduct research, restore datasets, and consult with librarians. See, e.g., Declaration of Dr. David Williams (ECF No. 3-1) ("Williams Decl.") ¶¶ 6, 10–13; Declaration of Dr. Giovanni De Amici (ECF No. 3-3) ("De Amici Decl.") ¶¶ 4–7, 10.

In recent years, NASA leadership has sought to "make better use of the space" at GSFC. Declaration of Raymond J. Rubilotta (ECF No. 8-3) ("Rubilotta Decl.") ¶ 14. By February 2022, NASA had developed plans for a large "transformation" of the Greenbelt campus, which included "constructing new spaces, renovating some facilities, divesting or partially divesting other spaces, and demolishing a number of other facilities." Id. ¶ 17. Initially, the agency did

7

*not* plan to close the Goddard Library. Id. ¶ 19; Moton Decl. ¶ 14; see generally 2022 Master Plan 4–5. NASA refrained from doing so because of a 2012 settlement agreement between GSFC leadership and the Goddard Engineers, Scientists and Technicians Association/IFPTE Local 29 ("GESTA"), the union representing federal employees at GSFC. Rubilotta Decl. ¶ 19. Pursuant to that settlement agreement, GSFC agreed to keep open the Goddard Library's physical location in Greenbelt. Id. ¶ 11; Moton Decl. ¶ 21; id., Ex. A at 1.

In August 2025, however, President Trump signed an executive order titled "Further Exclusions from the Federal Labor-Management Relations Program." See Exec. Order 14343, 90 Fed. Reg. 42683 (Aug. 28, 2025).[1] The executive order determined that the Federal Service Labor-Management Relations Statute did not apply to NASA because the agency has "as a primary function intelligence, counterintelligence, investigative, or national security work." Id.; see Rubilotta Decl. ¶ 20. In light of the executive order, GSFC leadership concluded that the 2012 settlement agreement "did not restrain the management choices that were available to [GSFC] and NASA as a whole." Rubilotta Decl. ¶ 21. In turn, the Goddard Library space in Building 21 "would be available for agency-level planning purposes." Id.

As the Greenbelt campus transformation continued in late 2025, GSFC leadership decided that Building 21 should "be adapted for a new use." Id. ¶ 23. NASA is "in the middle of a planning process" to determine how the Goddard Library space "can be best used to serve the agency's needs and efficiently use taxpayer dollars." Id. ¶ 24. The agency has yet to make any concrete "decisions regarding the future use of Building 21." Id. In the meantime, the Goddard Library has been "permanently shuttered" since January of this year. Moton Decl. ¶ 10.

---

[1] A lawsuit challenging the executive order is currently pending in this district. See Int'l Fed'n of Pro. & Tech. Eng'rs, AFL-CIO v. Trump, No. 25-cv-3615 (Oct. 8, 2025).

### 2. The Goddard Library Collection

While NASA leadership debated how to repurpose the Goddard Library's physical space, GSFC initiated a "60-day assessment" of the library collection in December 2025. Willis Decl. ¶ 25. During this assessment, a team of trained librarians determined which library materials would be retained by NASA and which would be "dispositioned" by the General Services Administration ("GSA"). Id. The team sorted the collection into five categories. First, NASA's Chief Archivist put aside 11 boxes of materials and 23 atlases for inclusion in the NASA Archives.[2] Id. ¶ 28. Second, NASA's Scientific and Technical Information ("STI") Program took approximately 575 technical reports for scanning into the STI Repository.[3] Id. ¶ 29. Third, the "remaining STI materials" were prepared for shipment to NASA's Glenn Research Center ("Glenn") in Cleveland, Ohio for "further analysis." Id. ¶¶ 6, 31. Fourth, the "material that NASA plans to keep in its research libraries" was boxed for shipment to the agency-wide library at Glenn, where employees will be able to access the materials electronically or by loan. Id. ¶ 32. Fifth, NASA set aside the remaining "excess" material to GSA for disposition.[4] Id. ¶ 33.

---

[2] The NASA Archives—which is "distinct" from the agency's research libraries—is where NASA "primarily collects unique materials and not publications." Willis Decl. ¶¶ 16–17 (citation omitted). Original materials stored at the NASA Archives "are not loaned out for research use." Id. ¶ 17 (citation omitted).

[3] The STI Repository "is the primary place where NASA stores conference papers, journal articles, meeting papers, patents, research reports, images, movies, and technical videos . . . created or funded by NASA." Willis Decl. ¶ 19 (citation and internal quotation marks omitted). The repository contains at least some "proprietary information, information subject to export controls, [and] privacy protected information" not accessible to the public. Id. ¶ 20.

[4] GSA has an established process for the disposition of federal property. See Willis Decl., Ex. A at 2–3. For example, the materials may be transferred to other federal agencies that "have a program need" for them, or the materials may be "available for other uses through public benefit conveyances." Id. at 2. At the initial scheduling conference in February, Defendants indicated that at least some of the materials—including "publicly available" books and journals—will be shipped to GSA for "destruction."

9

To sort the Goddard Library materials into these five categories, the team created and applied "a set of criteria" based on prior library consolidations at NASA and other federal agencies. Id. ¶¶ 36–39 ("The overall goal for the criteria was to avoid duplication, maximize mission research resources, and mitigate space constraints."); id., Ex. A (overview of the 60-day assessment plan "to determine final disposition (i.e., retain vs. excess)"). These criteria included whether the material was frequently used, whether it was "particularly rare," whether it was a duplicated in other NASA collections, and whether it aligned with "core agency missions." Willis Decl. ¶¶ 40–43. The team also "considered" the FRA, NASA's records retention schedules and policy directives, and "[s]tatutes applicable to [the] disposal of property." Id. ¶ 45. NASA insists that "no corners [were] cut" during the 60-day assessment. Id. ¶ 47.

The team concluded the assessment in January 2026. Id. The agency is prepared to send approximately 2,520 boxes of materials to Glenn for retention and approximately 3,396 boxes of materials to GSA for disposition. Id. ¶ 49.

### 3. The Database

The Database "serves as [NASA's] centralized repository of scientific data and mission documentation that enables ongoing research, validation, anomaly resolution, and future mission design." Moton Decl. ¶ 7. While the Database is "administratively distinct" from the Goddard Library, Plaintiffs submit that they are "functionally inseparable." Williams Decl. ¶ 7 (explaining that "[t]he Goddard Library functions as a 'Rosetta Stone' for raw data kept in the Database").

10

In September 2025, NASA took the Database offline for security reasons.[5] See Under Seal Declaration of Vaughn Q. Simon (ECF No. 8-4) ("Simon Decl.") ¶ 4. After concluding an investigation ███████████████████████████████████ recommended that the agency keep the Database offline ████████████████████████████████████. Id. ¶ 5. During this period, NASA is storing the Database materials ████████████████ ███████████. Id. ¶ 6. Defendants represent that no materials relevant to this case have been removed from the Database, see id., and there is no evidence before the Court that NASA's decision to temporarily take the Database offline is related to the closure of the Goddard Library.

C. Procedural History

Plaintiffs filed this lawsuit in February 2026. Their complaint alleges that NASA's decisions to close the Goddard Library, destroy some materials within the library, and "permanently shutter" the Database violate the FRA and APA and amount to *ultra vires* agency action. See Compl. ¶¶ 79–139. A few days later, Plaintiffs simultaneously moved for a temporary restraining order and preliminary injunction, citing the "imminent threat" that NASA's actions would cause the "irreversible loss of federal records and unique materials amassed by [the agency] over decades and entrusted to the Goddard Library and Database for preservation, access, mission continuity, and safety." Pls.' Emergency Mot. for TRO & Prelim. Inj. ("Pls.' Mot.") at 3. The Court promptly convened a scheduling conference, during which Defendants represented that (1) NASA took the Database offline for security reasons and does not intend to delete it; (2) the materials that NASA sends to Glenn will not be destroyed; and

---

[5] Defendants have provided additional details about the status of the Database under seal. Accordingly, the public version of this memorandum opinion is partially redacted. In the accompanying Order, the Court directs the parties to promptly indicate which portions of the redacted memorandum opinion, if any, may be unredacted.

11

(3) the agency would pause the shipment of materials from the Goddard Library to GSA through March 2026. Defendants have since clarified that NASA will "pause all previously scheduled shipments of materials to GSA until at least April 30, 2026." Opp'n at 24. The briefing on Plaintiffs' motion is now complete, and the Court held a hearing on April 21, 2026.

## II.   Legal Standards

A temporary restraining order and preliminary injunction are "extraordinary remed[ies] that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Postal Police Officers Ass'n v. U.S. Postal Serv., 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (Cooper, J.) (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004)). "The same standard governs both types of preliminary relief." Id. (citing Hall v. Johnson, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009)); see Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67, 72 (D.D.C. 2001). Specifically, the moving party must "establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Glob. Health Council v. Trump, 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008)).[6] The "balance of equities" and "public interest" factors merge when the government is the opposing party. See Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

---

[6] "In this circuit, it remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits." Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quoting Sherley v. Sebelius, 644 F.3d 388, 393, 398 (D.C. Cir. 2011)).

### III.  Analysis

Plaintiffs' motion seeks four forms of relief.  First, Plaintiffs ask the Court to enjoin NASA from "carrying out any disposition, destruction, shredding, dispersal, reclassification, transfer, commingling, or other irreversible alteration of federal records and research materials" associated with the Goddard Library and the Database.  Pls.' Mot. at 2.  Second, they ask that NASA and the Archivist maintain and preserve the "provenance and chain-of-custody" of any materials that have already been boxed or moved.  Id.  Third, they seek an order preventing NASA from closing the Goddard Library and disabling the Database "to the extent necessary to provide an interim, controlled access process for Plaintiffs . . . to identify and obtain specific materials necessary for ongoing work and for litigation purposes."  Id.  Fourth, they seek an order compelling the NASA Administrator and Archivist "to take the nondiscretionary enforcement steps required by the [FRA] under 44 U.S.C. § 3106."  Id. at 3.  The Court addresses NASA's decisions to close the Goddard Library, remove the materials in the library, and take the Database offline in turn.

### A.  Closure of the Goddard Library

Plaintiffs' complaint alleges that NASA's decision to close the Goddard Library violates the APA.  See Compl. ¶¶ 110–32.  Specifically, they contend that the closure was arbitrary and capricious because the agency (1) "fail[ed] to consider or explain the abandonment of prior commitments" to keep the library open in the 2012 settlement agreement with GESTA, and (2) "fail[ed] to consider . . . the institutional, operational, and statutory interests previously recognized by NASA itself in committing to maintain centralized physical library resources."  Id. ¶¶ 115–16.  Plaintiffs' motion for preliminary injunctive relief largely focuses on the *removal* of material from the Goddard Library—not the *closure* of the library itself—but it reiterates that

13

NASA employees have "concrete reliance interests" in keeping the library open. Pls.' Mot. at 10.

Plaintiffs are not entitled to preliminary relief on this claim because they have not established irreparable harm arising from the Goddard Library's closure. See Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). "[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies[.]" Sampson v. Murray, 415 U.S. 61, 88 (1974) (citation omitted). The D.C. Circuit "has set a high standard for irreparable injury." England, 454 F.3d at 297. The injury "must be both certain and great; it must be actual and not theoretical." Id. (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Moreover, "the certain and immediate harm that a movant alleges must also be truly irreparable in the sense that it is 'beyond remediation.'" Fisheries Survival Fund v. Jewell, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (quoting Elec. Privacy Info. Ctr. v. DOJ, 15 F. Supp. 3d 32, 44 (D.D.C. 2014)). The movant cannot simply allege irreparable harm; it must "substantiate" its claim with "proof." Wis. Gas Co., 758 F.2d at 674.

Plaintiffs' allegations of irreparable harm focus exclusively on the potential loss of records from the Goddard Library, not the closure of the physical library space in Building 21. For example, Plaintiffs' describe an "active packing-and-removal operation at the Goddard Library." Pls.' Mot. at 13. They maintain that this "mass removal event" constitutes irreparable harm because "[o]nce such *materials* are dispersed, discarded, or stripped of provenance, neither Plaintiffs nor the Court can later reconstruct the *collection* or its contextual integrity through a merits ruling." Id. at 13–14 (emphasis added); see also Reply Br. at 9–10 (asserting that the

14

irreparable harm analysis turns on "whether the [Goddard Library] *collection* was lawfully classified, inventoried, and routed before dispersal in a manner that preserves provenance and permits meaningful review" (emphasis added)).  The declarations attached to Plaintiffs' motion similarly home in on the "irreversible" harm caused by loss of the library's contents, not the library space itself.  See, e.g., Williams Decl. ¶ 14 ("If *records* housed at the Goddard Library . . . are destroyed, dispersed, or rendered inaccessible, the resulting harm will be irreversible." (emphasis added)); Moton Decl. ¶ 33 ("Once unique *materials* are discarded, hardware is dismantled, or *archives* are dispersed, they cannot be restored.  The harm is immediate and irreparable." (emphasis added)); De Amici Decl. ¶ 15 ("Reopening the Goddard Library and *restoring access to its collections* would immediately reduce the risk of analytical error and allow me to perform my assigned duties as required." (emphasis added)).  Indeed, Plaintiffs only ask the Court to enjoin the Goddard Library's closure "to the extent necessary to provide an interim, controlled access process for Plaintiffs . . . to identify and obtain *specific materials*[.]"  Pls.' Mot. at 2 (emphasis added).[7]

Put simply, Plaintiffs have not explained how NASA's plans to repurpose the Goddard Library space would cause irreparable harm if they could still access the materials that were once housed there.  See Sierra Club v. EPA, 793 F. Supp. 3d 158, 164 (D.D.C. 2025) (recognizing that "[m]ere injuries, however substantial, in terms of money, time, and energy necessarily expended

---

[7] At oral argument, the Court asked Plaintiffs' counsel to explain "precisely how [Plaintiffs] are irreparably harmed by the closure of the physical space as opposed to the dispersion and destruction of at least some of the materials[.]"  Rough Hr'g Tr. 11:3–5.  Here too, counsel responded by pointing to the potential loss of *materials*, not the closure of the Goddard Library's physical space.  See Rough Hr'g Tr. 11:21–22, 12:10–18 (describing Plaintiffs' concern as to whether they could "access the majority of the materials" if the Goddard Library closed and conceding that their "real interest" was in the "constituent parts of the collection").

in the absence of a stay are not enough" to establish irreparable harm (alteration in original) (citation omitted)). Accordingly, they are not entitled to preliminary relief based solely on NASA's decision to "permanently shutter" the Goddard Library.[8] See Winter, 555 U.S. at 22 (explaining that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction"). The Court must therefore turn to the crux of Plaintiffs' motion: NASA's handling of the Goddard Library collection.

### B. Materials Removed from the Goddard Library

Plaintiffs are primarily concerned about the "disposition or destruction" of records in the Goddard Library that they allege "will cause permanent, unrecoverable loss." Pls.' Mot. at 6. As noted above, they seek two forms of preliminary relief based on their "FRA-via-APA" claims. Price, 2019 WL 2526439, at *4. First, they request an injunction that would, among other things, bar NASA from "carrying out any disposition" of materials from the Goddard Library and compel the agency to produce an inventory of the materials slated for removal. Pls.' Mot. at 3. Second, they ask the Court to order the NASA Administrator and Archivist to perform their "nondiscretionary" duty to notify the Attorney General about the "actual, impending, or threatened unlawful destruction or removal" of records from the Goddard Library. Id.; see 44 U.S.C. § 3106(a)–(b). After surveying the availability of judicial review under the FRA and APA, the Court tackles each request in turn.

---

[8] By concluding that Plaintiffs have not established irreparable harm, the Court does not opine on whether Plaintiffs' challenge to the library closure is channeled to an administrative review scheme by the Civil Service Reform Act or the Federal Service Labor-Management Relations Statute. See Opp'n at 11–13. Nor does it pass on the merits of Plaintiffs' APA claim regarding the closure, assuming the Court has jurisdiction to hear it. See id. at 14–16.

16

### 1. Judicial Review Under the FRA

To assess the relief that Plaintiffs could obtain at this preliminary stage, the Court must first define the scope of judicial review under the FRA. The statutes themselves do not provide a cause of action for private parties to recover records unlawfully removed by an agency. See Kissinger, 445 U.S. at 148; Competitive Enter. Inst., 67 F. Supp. 3d at 31 ("[P]rivate litigants cannot state a claim for legal relief under [the] FRA."). However, this circuit has recognized that "in some cases, the APA can provide a jurisdictional hook for a suit alleging noncompliance with the FRA." CREW v. Pruitt, 319 F. Supp. 3d 252, 257 (D.D.C. 2018) (emphasis omitted). In Armstrong I, the D.C. Circuit considered three types of private actions: a "direct private action[] to require that agency staff comply with the agency's recordkeeping guidelines"; a claim that the agency's "recordkeeping guidelines and directives are arbitrary and capricious"; and a claim that the agency head and Archivist "breached the statutory duty to take enforcement action" through the Attorney General. 924 F.2d at 297. The court concluded that the first type of claim was not reviewable, but the latter two were. See id.; Pruitt, 319 F. Supp. 3d at 258.

First, the court found that "it would clearly contravene [the FRA's] system of administrative enforcement to authorize private litigants to invoke federal courts to prevent an agency official from improperly destroying or removing records." Armstrong I, 924 F.2d at 294 (citing Congress's decision to "strengthen the administrative enforcement mechanism rather than explicitly sanction[] litigation at the behest of private citizens"). In other words, "challenges to the agency's day-to-day implementation" of its recordkeeping guidelines are "unreviewable." Competitive Enter. Inst., 67 F. Supp. 3d at 32 (explaining that the FRA bars "any judicial assessment of agency compliance in specific factual contexts"); see also CREW v. Wheeler, 352 F. Supp. 3d 1, 11 (D.D.C. 2019) ("The APA does not grant federal courts the authority to engage

17

in pervasive oversight of an agency's compliance with the FRA.").

Second, the circuit concluded that a private party may bring an APA challenge to the sufficiency of the agency's "recordkeeping guidelines and directives," including a claim that they "do not adequately describe the material that must be retained as 'records' under the FRA." Armstrong I, 924 F.2d at 293; see Pruitt, 319 F. Supp. 3d at 258.  A private party may challenge either an agency's "formal policies" or its "informal practices."[9] Am. Oversight, 788 F. Supp. 3d at 21.  To evaluate whether an agency's recordkeeping guidelines pass muster under the APA, courts consider "whether they adequately explain the factors that agency staff should consider in deciding whether specific [materials] are records." Armstrong I, 924 F.2d at 297 n.14.  This assessment focuses on the sufficiency of the guidelines, not how the agency has applied them in practice.  See id. (recognizing that "the determination of whether a variety of particular [materials] are, in fact, records must be made by agency staff on a daily basis, and some innocent mistakes are bound to occur"); id. at 293–94 ("[A]gency personnel, not the court, will actually decide whether specific documents . . . constitute 'records' under the [agency's recordkeeping] guidelines.").

Third, Armstrong I held that "if the agency head or Archivist does nothing while an agency official destroys or removes records in contravention of agency guidelines and directives," then a private party may "bring suit to require the agency head and Archivist to

---

[9] To be sure, a plaintiff may not "transform an allegedly brazen compliance violation [of the FRA] into a 'policy or practice' claim simply by slapping the 'policy or practice' label on it." CREW v. Pompeo, No. 19-cv-3324 (JEB), 2020 WL 1667638, at *5 (D.D.C. Apr. 3, 2020); see also Competitive Enter. Inst., 67 F. Supp. 3d at 33 (noting that a plaintiff cannot challenge an agency's "decision to destroy [records] by casting its claim as a challenge to an illusory record-keeping policy").  While a challenge to a "*de facto*, agency-wide policy that results in systematic violations of the FRA" is actionable under the APA, a challenge to "discrete, unauthorized infractions committed by individual employees" is not. Am. Oversight, 788 F. Supp. 3d at 23.

fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action." Id. at 295; see CREW, 527 F. Supp. 2d at 110–11. This form of judicial review "reinforces the FRA scheme by ensuring that the administrative enforcement and congressional oversight provisions will operate as Congress intended." Armstrong I, 924 F.2d at 295. However, the available remedies for this cause of action are limited to ordering the agency head and Archivist to comply with their statutory duties. Am. Oversight, 788 F. Supp. 3d at 30–31 (citing 44 U.S.C § 3106(a)–(b)). That is, a private plaintiff "cannot obtain preservation [of records] as an independent remedy." Id. at 31.

Working within this framework, the Court turns to Plaintiffs' specific claims for preliminary injunctive relief.

### 2. Review of the NASA Archival Collections Schedule

Plaintiffs seek an injunction preventing NASA from "implementing or carrying out" its planned disposition of the Goddard Library materials and requiring the agency to "maintain and preserve, under litigation hold, the provenance and chain-of-custody of any materials" processed by its team of librarians.[10] Pls.' Mot. at 2. To justify this requested relief, Plaintiffs contend that the NASA Archival Collections Schedule—which took effect in September 2025—is arbitrary and capricious, see 5 U.S.C. § 706(2)(A), and contrary to the FRA's recordkeeping requirements, see id., and promulgated in excess of statutory authority, see id. § 706(2)(C).

As explained above, "courts may not entertain private suits alleging that agencies have improperly destroyed or removed records, but they may consider ones challenging whether agency guidelines that permit destruction of certain records are adequate under the FRA[.]"

---

[10] To the extent Plaintiffs "seek[] preservation as a litigation hold, such a hold is not appropriate in a non-FOIA case." Am. Oversight, 788 F. Supp. 3d at 31.

19

Pruitt, 319 F. Supp. 3d at 258. Mindful of this distinction, Plaintiffs' motion for preliminary injunctive relief frames their "FRA-via-APA" claims as a wholesale challenge to NASA's recordkeeping schedules. But in their reply brief and at oral argument, Plaintiffs suggest that they are challenging the *application* of the records schedules to the Goddard Library collection. Either way, the result is the same: Plaintiffs have not made the required showing to obtain preliminary injunctive relief.

a.  Challenges to the NASA Archival Collections Schedule

Consider first the APA challenges to the NASA Archival Collections Schedule itself. See Armstrong I, 924 F.2d at 291 (recognizing that district courts may assess whether an agency's recordkeeping policies violate the APA "because they permit the destruction of 'records' that must be preserved under the FRA"). Plaintiffs' complaint appears to challenge the broader NRRS, which contains numerous records schedules. See Compl. ¶¶ 7 & n.1 (citing the full NRRS), 79–87 (Count I alleging that Defendants' approval and implementation of the NRRS was an arbitrary and capricious agency action), 88–94 (Count II alleging that NASA and the Archivist exceeded their statutory authority by approving and implementing the NRRS), 103–09 (Count IV alleging that the NRRS was "approved and implemented without observance of procedure required by law"). This broadside attack on the NRRS also forms the basis of Plaintiffs' motion for preliminary injunctive relief. See, e.g., Pls.' Mot. at 9 ("[T]he court would almost certainly find the implementation of the [NRRS] to be arbitrary and capricious."), 12 ("Plaintiffs are likely to succeed on their claims that the [NRRS] unlawfully shifts appraisal and preservation determinations and dilutes safeguards required by the FRA and applicable NARA regulations[.]"). However, Plaintiffs have since narrowed the scope of their challenge, clarifying that their APA claims pertain only to the NASA Archival Collections Schedule. See Reply Br. at

20

8; Rough Hr'g Tr. 18:5–8 (acknowledging that the NASA Archival Collections Schedule—not the full NRRS—pertains to the sorting of the Goddard Library).

The problem is that Plaintiffs have not explained *how* the NASA Archival Collections Schedule is deficient under the FRA. To be sure, the complaint broadly alleges that NASA's records schedules "eliminated or materially diluted mandatory safeguards governing the identification and preservation of historically significant and research-valuable records during mass disposition events." Compl. ¶ 81. It further contends that the schedules authorize NASA to determine "in the first instance . . . whether records warrant continued preservation." Id. ¶ 91; see also id. ¶ 107 (alleging that the schedule "authoriz[es] discretionary internal agency review of records without independent appraisal by the Archivist"). But when the Court specifically asked at oral argument how the NASA Archival Collections Schedule was "inadequate" under the FRA, Plaintiffs disavowed any argument "about the irregularity of the schedule." Rough Hr'g Tr. 19:24–25. "Without more precise factual allegations that highlight *which* particular deficiencies make the challenge to [the NASA Archival Collections Schedule] inadequate," Plaintiffs' challenges to the adequacy of the records schedule—to the extent they have not been waived—amount to "conclusory allegations" insufficient for preliminary injunctive relief. Jud. Watch, Inc. v. FBI, No. 18-cv-2316 (RC), 2019 WL 4194501, at *9 (D.D.C. Sep. 4, 2019).

This shortcoming distinguishes Plaintiffs' request from America First Legal Foundation v. Becerra, a case in which another court in this district granted a preliminary injunction based on an agency's deficient recordkeeping policy. No. 24-cv-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024). In Becerra, the plaintiff challenged a Centers for Disease Control and Prevention ("CDC") policy that authorized the deletion of its employees' emails within a few months after they left the agency. See id. at *2–3. This policy conflicted with the Archivist's general records

21

schedule requiring agencies to retain emails for at least three years. See id. at *2, 9. The court concluded that the CDC "policy" was "not approved by NARA" and failed to "preserve emails for a sufficient duration." Id. at *12. Because the policy likely violated the FRA and the plaintiff satisfied the remaining preliminary injunction factors, the court "enjoin[ed] CDC from deleting or destroying the emails," except as permitted by the Archivist-approved schedule, "unless and until the Archivist approve[d] an alternate schedule by which CDC [must] manage the retention and disposal of such emails." Id. at *16. In other words, the court "insist[ed] upon a full-scale method" for preserving the emails until the agency "came up with new, adequate records management guidelines to replace" the deficient guidelines that authorized their destruction. Armstrong II, 1 F.3d at 1288 n.12.

Unlike in Becerra, Plaintiffs have not explained how the Archivist-approved NASA Archival Collections Schedule is "unlawful or inadequate" under the FRA. 2024 WL 3741402, at *12. Accordingly, there is not a sufficient basis to grant the requested injunction.

b. Challenges to the Sorting of the Goddard Library Collection

In their reply brief and at oral argument, Plaintiffs change course and attack the *means* by which NASA sorted the Goddard Library collection. Plaintiffs describe the Goddard Library as a "mixed collection" containing both records and non-records. Reply Br. at 4–6. They then fault the agency for not following the "records-governance steps" that they claim are necessary to preserve records under the FRA. Id. at 5; see also id. at 6 (questioning "whether the agency could have undertaken the kind of careful classification, inventory, and schedule-based analysis required for a mixed collection of this size" in 60 days). Put another way, Plaintiffs contend that NASA did not comply with the FRA when sorting through the Goddard Library collection. See id. at 6 ("It is enough that NASA's own declarations do not show the satisfactory recordkeeping

22

guidelines and safeguards one would expect if records-law obligations *were being followed* for a mixed collection on this scale." (emphasis added)), 7 ("If any materials routed into the GSA stream were in fact records, permanent records, or unscheduled records, the wrong legal regime *was being applied*." (emphasis added)), 8–9 ("Plaintiffs challenge the legality of the schedule *as implemented* in the context of a rapid closure, sorting, transfer, and threatened disposition event at [GSFC]." (emphasis added)); Rough Hr'g Tr. 17:6 (describing Plaintiffs' belief that the disposal of materials "was not done correctly"), 19:21–22 (noting that Plaintiffs "can argue about the irregularity of the [sorting] process").

This argument runs headlong into Armstrong I and its progeny, which make clear that private litigants may not bring suit to "enjoin agency actions in contravention of agency [recordkeeping] guidelines." 924 F.2d at 294. Challenges to the propriety of NASA's "records disposal decisions" during the Goddard Library sorting process are "prohibited" under both the FRA and the APA. Competitive Enter. Inst., 67 F. Supp. 3d at 33. If such claims were actionable, the Court would need to "impermissibly inject [itself] into the 'details of record management,' a task better left 'to the discretion of agency heads.'" CREW v. Pompeo, No. 19-cv-3324 (JEB), 2020 WL 1667638, at *5 (D.D.C. Apr. 3, 2020) (quoting Armstrong I, 924 F.2d at 293). Because the FRA does not invite judicial review of a NASA records schedule "as implemented" to the Goddard Library collection, see Reply Br. at 8, the Court cannot grant Plaintiffs' request for preliminary relief, see Am. Oversight, 788 F. Supp. 3d at 24–25 (finding that a plaintiff was not entitled to a preliminary injunction for claims based on isolated instances of agency officials deleting records in violation of the FRA).

### 3. Enforcement Action by the NASA Administrator and Archivist

Plaintiffs next request an injunction compelling the NASA Administrator and Archivist to fulfill their obligations under the FRA to "protect records from actual, impending, or threatened unlawful destruction or removal" through "referral to the Attorney General and notification to Congress." Pls.' Mot. at 3 (citing 44 U.S.C. § 3106). That is, Plaintiffs seek to "compel agency action unlawfully withheld or unreasonably delayed" under the APA. 5 U.S.C. § 706(1); Kerry, 844 F.3d at 954. To establish a likelihood of success on this claim, Plaintiffs "must convincingly (1) identify records that fall under the FRA; (2) allege that those records are being removed or destroyed in violation of the FRA; and (3) allege that the [NASA Administrator] and/or Archivist knew about the FRA violations and yet failed to initiate corrective action." Price, 2019 WL 2526439, at *6; see Becerra, 2024 WL 3741402, at *4–10 (applying these factors when evaluating the likelihood of success on a § 3106 claim).

Plaintiffs have failed to make that showing. Assuming *arguendo* that the first two requirements are satisfied, Plaintiffs have not demonstrated that the NASA Administrator and Archivist *knew* the agency was violating the FRA by sorting the Goddard Library collection in the way it did. As this Court has previously explained, neither an agency head nor the Archivist has a duty to act under 44 U.S.C. § 3106 "until they know of an actual or impending FRA violation." Price, 2019 WL 2526439, at *11 (citing 44 U.S.C. § 3106); see Kerry, 844 F.3d at 954 (noting that the APA "permits a claim that an agency failed to take a *discrete* agency action that it is *required to take*" (citation and internal quotation marks omitted)). Put another way, a private party must "plausibly allege that the relevant agency head and Archivist know about an FRA violation in order to plausibly allege that they should be compelled to take action under

24

§ 3106; merely alleging an FRA violation by itself will not suffice." Price, 2019 WL 2526439, at *11.

In Price, this Court addressed a motion for preliminary relief based on a similar "failure-to-act § 3106" claim. Id. at *5. The Court held that the plaintiff was not likely to succeed on the merits because (1) the relevant agency (the Department of Justice) was not actively violating the FRA, and (2) even if it was, there was insufficient evidence that the relevant agency head (the Attorney General) and the Archivist knew of any FRA violation. Id. at *11. In reaching the latter conclusion, the Court considered both the text of § 3106 and its surrounding context. Under the statute, the agency head's "duties . . . to notify the Archivist of the destruction of records and implement remedial action attach only after he has identified the *unlawful* 'actual, impending, or threatened' removal of records." Id. (quoting 44 U.S.C. § 3106(a)). The same is true for the Archivist: His duty to request that the Attorney General initiate a remedial action does not attach "unless he knows of any 'actual, impending, or threatened unlawful removal . . . of records[.]'" Id. (alterations in original) (quoting 44 U.S.C. § 3106(b)).

The Court then recognized that a "finding of a violation" is a "condition precedent" to another FRA provision requiring the Archivist to take enforcement action, and "it would make little sense to read § 3106 differently[.]" Id. at *12 (citing 44 U.S.C. § 2115 and Pruitt, 319 F. Supp. 3d at 261–62). Indeed, both the D.C. Circuit and other courts in this district "appear to construe § 3106 as creating a conditional obligation." Id. (citing Armstrong I, 924 F.2d at 296, and Cause of Action Inst. v. Pompeo, 319 F. Supp. 3d 230, 232 (D.D.C. 2018)); see also Kerry, 844 F.3d at 956 (noting that Armstrong I "took pains to stress that" § 3106 requires the agency head and Archivist to act "*whenever they became aware* of records being *unlawfully* removed or destroyed" (emphasis added) (citing 924 F.2d at 295)). Finally, requiring the agency head and

25

Archivist to have "actual knowledge that records are being *unlawfully* removed or destroyed before either can be sued . . . ensures that courts don't entertain the cause of action that [Armstrong I] held was unavailable to private litigants." Price, 2019 WL 2526439 at *13 (explaining that without this condition, courts would be required to decide "whether an FRA violation has occurred in the first instance," which is a question "unfit for judicial review"). Accordingly, this Court held that "a predicate to a viable § 3106 failure-to-act claim is a plausible allegation that the applicable agency head or Archivist knows that records are indeed being removed or destroyed in contravention of agency policy or the FRA." Id.

Plaintiffs have not established that predicate here. The complaint makes the conclusory allegation that that "[t]he Archivist was . . . on notice that records housed at the Goddard Library include records of unique historical and research value and that closure of the library posed an imminent risk of unlawful destruction, dispersal, or irreversible loss of such records." Compl. ¶ 99. Plaintiffs' motion for preliminary injunctive relief only briefly addresses § 3106, noting that "a rapid mass review and active dismantling of a records repository" is an "'actual, impending, or threatened' unlawful destruction or removal that triggers notification requirements" under the statute.[11] Pls.' Mot. at 13. And at oral argument, Plaintiffs' counsel submitted that both the NASA Administrator and the Archivist should have been "on notice" that the sorting process may have violated the FRA based on "the nature of the review, the time span, [and] the amount of materials that the agency needed to move through." Rough Hr'g Tr. 20:17,

---

[11] In support of their argument, Plaintiffs cite to Am. Oversight, where the court granted preliminary relief by ordering the relevant agency head defendants and Acting Archivist to fulfill their § 3106 obligations. See 788 F. Supp. 3d at 30. But that case is easily distinguishable, as the agency head defendants and Acting Archivist "were or are part of the [Signal] chats set to auto-delete" that were at issue in the case. Id. at 26 (concluding that the defendants were "*aware* of recordkeeping practices that should trigger their FRA obligations and yet . . . neglected to fulfill them" (emphasis added)).

26

21:12–14; see also Rough Hr'g Tr. 21:19–24 (agreeing that the NASA Administrator and Archivist were "negligent").

But recall that "[a] preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Cobell, 391 F.3d at 258 (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)). While Plaintiffs repeatedly allege that the 60-day assessment poses a hypothetical—yet unspecified—risk that federal records may be destroyed, they have not provided evidence that "either the [NASA Administrator] or the Archivist found an actual, threatened, or impending unlawful removal or destruction of records."[12] Price, 2019 WL 2526439, at *14. Because they have not "show[n] that the condition precedent to § 3106's mandatory duties has been satisfied," Plaintiffs have not established a likelihood of success on their failure-to-act § 3106 claim. Id. (denying a preliminary injunction motion because the Court was "simply unconvinced" that the plaintiff "made that clear showing on the first factor").

* * *

Because Plaintiffs have not shown a likelihood of success on the merits of their "FRA-via-APA" claims, they are not entitled to a preliminary injunction.[13]

---

[12] The complaint cites a social media post by the NASA Administrator that addressed the Goddard Library closure. See Compl. ¶ 66 & n.8. But that post undercuts any suggestion that the Administrator knew of an FRA violation. Rather, the Administrator asserted that the agency was *not* "'tossing out' important scientific or historical materials," but instead following "a deliberate process to evaluate materials, ensuring they are digitized, transferred to other libraries, or otherwise preserved for historical purposes." NASA Administrator Jared Isaacman (@NASAAdmin), X (Jan. 2, 2026 at 5:01 PM), https://x.com/NASAAdmin/status/2007210687685337266 [https://perma.cc/5HGD-XFC6].

[13] Plaintiffs' complaint also alleges that Defendants engaged in *ultra vires* agency action by both approving the NASA Archival Collections Schedule and conducting a "rapid, opaque review" of the Goddard Library records pursuant to the schedule. See Compl. ¶¶ 133–39. In their motion for preliminary injunctive relief, Plaintiffs assert in passing that they are likely to succeed on this claim "to the extent the closures [of the Goddard Library and the Database]

### C. Taking the Database Offline

In addition to their claims about the Goddard Library's physical space and the materials once housed within it, Plaintiffs allege that the decision to "permanently close[]" the Database was arbitrary and capricious. See Compl. ¶¶ 110–32. In turn, their motion for preliminary injunctive relief asks the Court to order that Defendants not destroy or irreversibly alter the Database while the litigation is ongoing. See Pls.' Mot. at 2.

As noted above, Defendants have since provided a declaration which clarifies that the Database was taken offline temporarily for security reasons, and it will remain offline ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. See Simon Decl. ¶¶ 3–5. In the meantime, the material on the Database is being held ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and no material relevant to this litigation has been removed. Id. ¶ 6. Plaintiffs do not address this declaration in their reply brief, but they reiterate their request that the Database and its "associated metadata" be preserved as this case proceeds. See Reply Br. at 2, 11–13.[14]

Because Plaintiffs have failed to show that the Database's temporary "offline" status—which preserves the Database material—would cause irreparable harm, the Court denies Plaintiffs' motion for a preliminary injunction on that claim as well. See England, 454 F.3d at 297.

---

functionally authorize unlawful record loss." Pls.' Mot. at 12 (citing Armstrong I, 924 F.2d at 284–86). But again, "the FRA precludes judicial review" of claims that an agency is "improperly destroying or removing records." Armstrong I, 924 F.2d at 294.

[14] At oral argument, Plaintiffs conceded that "there is nothing on the record that says that the closure of the [D]atabase is permanent." Rough Hr'g Tr. 13:19–21.

## IV.  Conclusion

For the foregoing reasons, the Court will deny Plaintiffs' [3] Emergency Motion for Temporary Restraining Order and Preliminary Injunction.  A separate Order shall accompany this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: May 12, 2026